## CITY OF TYLER et al. v. SMITH COUNTY.

### No. 6504.

Court of Civil Appeals of Texas. Texarkana.

June 29, 1950.

Rehearing Denied June 7, 1951.

Lasseter, Spruiell, Lowry, Potter & Lasater, Troy Smith, and Ted Chilcote, all of Tyler, for appellants.

Weeks, Hankerson & Surles, Tyler, for appellee.

HALL, Chief Justice.

This is an action for a declaratory judgment brought by appellee, Smith County, against the City of Tyler and two classes of citizens of said City, namely, those owning property fronting the courthouse square and those citizens owning the property within the 100 acres comprising the original town site. The suit concerns the title to the courthouse square within the City of Tyler and the rights, if any, of the two classes of citizens in the courthouse square. The City claimed title to the courthouse square and joined issue with the county in that respect. The two classes of citizens asserted that they had certain vested rights

with respect to the courthouse square by reason of the dedication of same as a public square. Trial was to the court without a jury and resulted in a judgment for Smith County against all appellants.

By point one the city asserts that the trial court erred in holding that the title to the courthouse square was vested in fee simple in Smith County and not in the City of Tyler. This point is similar to points two and four brought forward by the two classes of citizens of the City and the three will be considered together.

Smith County was created by Act of the Legislature approved April 11, 1846. The Act designated the territory to comprise the county and appointed five persons as commissioners, among whom was James Hill, to run and mark the boundary lines of Smith County, locate its county site (within three miles of the center of the county), receive donations of land including the proposed county site. If no donation were made the commissioners were required to condemn and purchase 100 acres for a county site, and "proceed to lay off a town, and to sell the lots thereof to the highest bidder, reserving lots for a court-house, jail, and such other public lots as they may deem necessary." The Act provided further "that the county site of said county of Smith shall be known and styled Tyler."

The Act of April 11, 1846, was on February 26, 1848, amended by requiring: " * * * the commissioners appointed by the above recited act, to pay out of the proceeds of the sale of town lots ———, the County Seat of said County, the amount stipulated by them to the contractors for building a courthouse in said county, and to sell the remainder of said lots if any there be, and apply the proceeds thereof to the completion of a good and substantial courthouse and jail, and such other public buildings as they may deem necessary for the use of said county, *to pay over to the county treasurer of said county the overplus if any, after paying the necessary expense incurred by them in carrying out the provisions of this act.*" (Italics ours.)

The original act was amended further on January 19, 1850, directing the commissioners appointed under the original act to file with the county clerk " * * * a correct statement of their proceedings, the number of lots which have been sold, the amount received for said sales, and the amount paid out by said commissioners, and for what purposes expended, etc. * * *"

The last amendment provided further that the commissioners enter into a bond in double the amount of money in their hands, conditioned that they will apply the proceeds, or so much thereof as is necessary to the completion of a courthouse and jail and to pay over to the county all money remaining in their hands, together with all bonds and papers relating to their acts as commissioners after which their functions as such shall cease.

No land was donated to the commissioners as a county site, so they purchased from one Edgar Pollitt for $150.00 cash a 100-acre tract of land, and this tract of land forms the original town site of the City of Tyler. The deed from Pollitt to the 100 acres is dated February 6, 1847, and is to James Hill, attorney in fact for said commissioners and his successors in office for the use and benefit of said town of Tyler. The pertinent part of said deed follows:

"The State of Texas } Know All Men By
County of Smith. }

These Presents: That I, Edgar Pollitt of said State and County, for and in consideration of the sum of One Hundred and Fifty Dollars to me in hand paid by James C. Hill, attorney in fact for commissioners appointed to select and locate the Town of Tyler, the County Site of Smith County, the receipt whereof is hereby acknowledged, have and do by these presents bargain, sell, alien, convey and passover unto the said James C. Hill, attorney in fact for said Commissioners and his successors in office for the use and benefit of the said Town of Tyler, the County Site of Smith County and State aforesaid forever in fee simple all my right, title interest in and to one hundred acres of land, it being a part of South end of Survey No. 134 in the name of Isaac Lollar situated as follows, to-wit: (Description of land)

"To have and to hold said tract or parcel of land for the use and benefit of the Town of Tyler, the County Site of said

county, together with all and singular the rights, members and appurtenances unto the same belonging or appertaining, and I the said Edgar Pollitt for myself, my heirs, executors, administrators and assigns do and will forever warrant and defend the right, title, interest and claim of in and to said tract or parcel of land above described unto the said James C. Hill, attorney in fact for said comrs. and his successors in office against myself, my heirs and assigns and the claim or claims of any and all persons whatsoever."

There is no dispute with respect to the acts of the commissioners in performing the duties required of them in running and marking the boundaries of Smith County; the purchase of the 100-acre tract of land on which to locate the City of Tyler, the County Site of Smith County; locating and laying out the City of Tyler; selling city lots and with the proceeds constructing a courthouse and jail on the lots reserved for that purpose. From the record evidence ta hand and brought forward, the terms of the original Act creating Smith County and the two Acts amending it were carried out by the commissioners appointed by the Legislature for that purpose. We must then determine from the acts and conduct of the commissioners taken in connection with the instruments of record bearing on their acts and conduct the rights of the parties to this controversy.

The deed from Pollitt to Hill contains the statement that Hill purchased the 100 acres "for the use and benefit of the said town of Tyler." By virtue of this provision it is claimed by appellants that the title to the courthouse square is in the City of Tyler. In construing the Pollitt deed we must consider in connection therewith the Act of the Legislature creating Smith County and the two amendments thereto. A reading of this Act and these two amendments reveals that the primary purpose of the legislature in passing them was to create and establish Smith County, as a unit of the government of the State, and, as a part of that purpose was the location and establishing the town of Tyler as the County Site where the governing body of Smith County could be maintained. The Legislature was not interested primarily in establishing the town of Tyler but only as an incident to the creation of Smith County. As further evidence of this fact the Act of the Legislature creating Smith County required the commissioners to locate the center of the county and to receive by donation, or condemnation and purchase, land including the central point of the county and "proceed to lay off a town, and to sell the lots thereof to the highest bidder, *reserving lots for a court-house, jail, and such other public lots as they may deem necessary.*" (Italics ours.) By the subsequent amendments to the original Act the commissioners were directed to use the money derived from the sale of the lots for the erection of a courthouse and jail and *pay over to the county treasurer all money remaining after deducting the expenses incurred by them in performing their duty required under the three acts.* One item of their expense most certainly was the purchase price paid to Pollitt for the 100 acres of land. These circumstances taken in connection with the unequivocal requirement in the original act creating Smith County to reserve lots upon which to construct a courthouse, jail and other public buildings, together with the further facts that the plat of the City of Tyler was recorded in the county deed records in April, 1854, which shows a blank space where the courthouse is now and has been located and continually used for over 100 years, compels the conclusion that the fee simple title to the courthouse square, except the paved streets surrounding it, is in Smith County. The statement contained in the deed from Pollitt to Hill, conveying the 100 acres "for the use and benefit of the said Town of Tyler" must yield to the legislative demand to the commissioners who received the deed to reserve certain lots in said town upon which to construct buildings such as a courthouse and jail for the benefit of the county. It was said by Justice Harvey, in discussing a similar situation in the unreported case of the City of Henderson v. Rusk County, of which we must take notice: "Presumably the $500.00 consideration for the conveyance was paid by the county, or for its benefit. * * *

If the deed had the effect of vesting title in the Town of Henderson, the facts are of such nature as to support an implication that there was a trust in favor of the county."

Quoting further from Justice Harvey's opinion: "However, where the dedication is for some special purpose, as for instance when the land is set aside for the location of a jail or courthouse, such use for the particular purpose may be abandoned. State v. Travis County, 21 S.W. 1029. If we grant, which we do not think the facts justify, that there was a dedication of Lot No. 2 for the use of the jail, the county had the right to abandon it for such purpose. The title then would revert to the donor, which, under the facts herein were the commissioners, who held the title for the benefit of the county. We think the trial court was correct in denying a recovery by the City of Henderson and in holding that title to the lots in controversy was in Rusk County."

These points are overruled.

Appellants, the two classes of citizens of the City of Tyler, under point one assert that the trial court erred in holding that the square had not been dedicated as a "public square."

On November 21, 1855, about 9½ years after the passage of the Act creating Smith County and appointing commissioners "to run the boundary lines of said county and to perform all other duties required by said Act," the Commissioners' Court of Smith County ordered James Hill, one of the original commissioners, to survey "the public square in the Town of Tyler, and that R. B. Long put a permanent rock corner at each one, and Hill to also give the width of each street in the Town of Tyler, and make field notes of same."

On February 23, 1856, Hill returned the the field notes made in compliance with the order shown above and they were recorded during the early part of July, 1856. The portion of the field notes pertinent are:

"Field notes of the 'public square' of Tyler, Smith County I commenced to survey the Square 6 in. East of the center of the present courthouse at the original rock placed there at the commencement of said town. Thence I run from said beginning North and South 200 feet and East and West 350 feet that makes the Square 400 feet North and South and 700 feet East and West including the center street 90 feet wide and the 4 streets bounding the square which each 50 feet wide all the balance of the streets is 50 feet wide, The present sheriff R. B. Long had placed at each corner of the square including the street a road statement of the size of the Blocks and the lots therein." (Here follows the dimensions of the lots and blocks.)

"The above blocks and Lots is all numbered on the map of said town accompanying these field notes as also of the streets with their width and names. February 23rd, 1856.

"J. C. Hill,
Surveyor."

A deed from the commissioners to William B. Ochletree, dated April 18, 1849, shows that the commissioners did "expose to public outcry on the 21st day of December, A.D. 1846, Lots Nos. One and Two in Block No. One in the plat of the said Town of Tyler, for which said lot William B. Ochletree became the highest bidder * * *." The deed was made two years after Ochletree had made the purchase. It seemed that the commissioners sold the lots on two years' credit and did not execute deeds until the purchase price had been paid, which accounts for the difference in the date of the sale and the date of the deed. The plat mentioned in this deed has not been found. As heretofore pointed out the oldest known map of the city was made by Commissioner Hill and was recorded in April, 1854. In the center of this map or plat is a rectangular blank space upon which the county courthouse is now located. There is nothing to show that this is the map exhibited by the original commissioners at the time of the sale of the lot to Ochletree. There are also in the record excerpts from later deeds made during the 1850's and 1860's, showing abuttment on the "Public Square." The evidence also shows that the residents of the City as

well as those of the County generally used the courthouse square as a place to park their horses and vehicles from an early date. The record contains a photograph of a part of the square during Circus Day in Tyler, which shows that portion of the square entirely covered by people, buggies, wagons and horses. There was at one time a market constructed on the square (with permission of the Commissioners' Court). At an early date a well was dug on the square for use by the public. Years later this well was filled up. Several courthouses have been constructed on the square, as well as other county buildings. The early court buildings occupied much less land than is now in use around the present courthouse and for which the county makes claim. At one time a band stand was constructed on the square and was by order of the Commissioners' Court removed. The courthouse as well as the enclosure surrounding it is now, and has been for many years, in exclusive possession and control of the county. The beautification and landscaping of the courthouse lawn has been done by the county. It employs and pays several men for this purpose. The county paid its one-third portion for paving the streets surrounding the square, the other two-thirds being paid by the city and other adjoining property owners. The above summarized facts and circumstances were before the trial court.

"A dedication has been defined to be the act of devoting or giving property for some proper object, and in such manner as to conclude the owner." Oswald v. Grenet, 22 Tex. 94; Adams v. Rowles, Tex.Sup., 228 S.W.2d 849. The burden of proof to establish a dedication of the courthouse square as a public square rested upon appellants. Hay v. Cunningham, Tex.Civ.App., 77 S.W.2d 1057. A dedication may be made either by grant or result from acts and conduct of the owner. They are also known as statutory and common law dedications. City of Uvalde v. Stovall, Tex.Civ.App., 279 S.W. 889, writ refused; 26 C.J.S., Dedication, §§ 1, 2, and 3, pages 49, 50, 51.

It seems to be very generally held by the courts of this state, as well as those of other states, that where town lots are sold with reference to laid out streets, parks and squares on a plat, such act manifests in intention on the part of the seller to dedicate to public use such streets, parks and squares unless a contrary intention is disclosed. 26 C.J.S., Dedication, § 23, par. b, page 82, and the numerous authorities cited supporting the text. These appellants rely on the acts and conduct of the original commissioners, as well as subsequent governing bodies of Smith County, to establish a dedication of the courthouse square in the City of Tyler as a public square. While, on the other hand, the county contends that the use of the courthouse square by the public was permissive only as evidenced by the complete control of the property by the county and its continued use as a site for the courthouse. The acts of the county commissioners in requiring the removal of the band stand located on the square, ordering and paying its one-third of the cost of the paving around the courthouse square and in landscaping and beautifying the courthouse lawn, do not indicate an intention to dedicate the courthouse square as a public square.

Appellants rely strongly on the case of Clement v. City of Paris, 107 Tex. 200, 175 S.W. 672, 674. That case arose out of certified questions from this court to the Supreme Court with respect to the sufficiency of plaintiff's pleadings in the trial court, and the answer to the question by the Supreme Court necessarily assumes as true all averments in the petition. The Supreme Court speaking through Judge Phillips held that the pleadings of the plaintiff were sufficient to allege a dedication, stating: "The petition is clearly sufficient, in our opinion, as a pleading that at the inception of the town of Paris the square in question was dedicated to a particular public use, namely, the public square of the county site of the county, to serve as a location for the county courthouse and as a public square in that connection. *The original and supplementary acts of the Congress of the republic in that relation empowered the commissioners therein charged with the duties conferred with respect to*

*the location of the county site of Lamar County 'to lay out a town, sell lots, contract for public buildings, and do all things necessary for the promotion of the interests of the county.' This invested the commissioners with the authority to select and designate a site for the courthouse, and for the public square then and now commonly used in this state in that connection, and to dedicate the plot of ground so selected to that particular use, as an essential part of the duties imposed upon them by the acts.* The petition charges that the commissioners did so select and dedicate this particular square for that purpose. Entirely apart from the acts of Wright, the donor of the tract of land for the county site, his donation, his bond for title, and his deed, it *sufficiently avers such a dedication by the commissioners themselves, in their agreement with Wright to that effect, their preparation and record of the original town plat with the square designated thereon, their public announcement of its purpose and their sales of lots on the faith of such location and public use all of which could be competently shown in the evidence as constituting the dedication pleaded.*" (Italics ours.)

The opinion of this court reversing and remanding the case is shown in 154 S.W. 624. The case at bar differs from the Clement case cited above, in the following material respects: Wright, the donor of the 50 acre tract of land for the county site of Lamar County, had an "understanding and agreement with the county commissioners acting for and on behalf of Lamar County that said donation should be accepted for the purpose aforesaid (county site), subject to the condition that an open square should be laid off in the center of said 50 acres and dedicated for the use of the county and the public for the sole purpose of a county courthouse and an open space around it forever. * * * That at and before the sale (of lots in the City of Paris) the square was laid off for the benefit of the public for courthouse purposes, and was so dedicated and intended to be so irrevocably dedicated." The square in Paris was laid off 216 feet square with a street 50 feet wide on each side of it.

The commissioners announced that it was laid off for the benefit of the public for courthouse purposes and was so dedicated. At and before the time of the sale (of the lots) the above-mentioned map was exhibited showing the square and its surroundings, which had been duly recorded in the deed records of the county; and the purchasers of the lots abutting upon the square bought them with reference to the plat and on the faith of the square being used alone for courthouse purposes. Similar facts appear in all cases examined by us holding a dedication of parks, streets or public squares by individuals or municipal authorities. In Hay v. Cunningham, supra [77 S.W.2d 1058], it is said: "To establish a dedication the proof must be clear and satisfactory. * * * Leaving a lane open for use and its use by the public, and subsequently conveying adjoining land by reference thereto, does not conclusively and as a matter of law establish such dedication. It still remains a question of fact", citing Ramthun v. Halfman, 58 Tex. 551. See also Boone v. City of Stephenville, Tex.Civ.App., 37 S.W.2d 842; City of Houston v. Scanlan, 120 Tex. 264, 37 S.W.2d 718; 26 C.J.S. Dedication, § 11.

 True the record here shows that the deed from the original commissioners to Ochletree makes reference to a map or plat, but no map is produced bearing a date prior to that of the Ochletree deed. The first map of the City brought forward in the record to which reference has heretofore been made was recorded in April, 1854, almost eight years after the sale to Ochletree of Lots One and Two in Block One of the City of Tyler. It has been held that lost records raise no presumption of a dedication. Gaines v. Merryman, 95 Va. 660, 29 S.E. 738. It is also said in 26 C.J.S., Dedication, § 44, page 115, under the paragraph User; License: "Ordinarily, no presumption of dedication arises from mere proof of user alone, particularly from proof of permissive user and, as regards dedication, a user is presumed to be permissive and not adverse. In other words, there must usually be proof of some act or word or course of conduct on the part of the alleged dedicator fairly indicating his actual

intent to give or grant the easement to public use. Proof of user by the public for a long period of time has been held, however, sometimes under statute, and particularly when coupled with proof of other circumstances showing such intent sufficient to raise a presumption of dedication against the owner of land." But, "proof of license never raises a presumption of an intent to dedicate."

There is no statement in this record by any one indicating an intention by the county to dedicate the courthouse square as a public square irrevocably.

█ As we view the record in this case the proof offered by appellants is as consistent with appellee's theory that the use of the courthouse square by the public was permissive as with appellant's theory of dedication to public use. In such circumstances we would not be warranted in disturbing the judgment of the trial court rendered for the county.

All other points not specifically discussed herein have been examined and are overruled.

The judgment is affirmed.

## WILLIAMS, Justice (dissenting).

I am in full accord with the majority opinion that title to the area in controversy does not rest in the City of Tyler.

The other conclusion that the area was not dedicated for use as a public square and that the fee simple title rests in Smith County without any restriction to sell or abandon same as a public square are, in my opinion, contrary to the undisputed facts in this record.

It appears that the majority opinion turns on the reasoning that this long continued use of the area by the public was by permission of the Commissioners' Court; and (2) a map or plat of the city was not of record when the lots were first sold along in 1846, and no proof that the plat was exhibited to the purchasers at such public sale.

The original act of the Legislature, enacted in April, 1846, authorized and directed the agents or commissioners therein named to lay off the town of Tyler and to sell lots to the highest bidder. It is to be observed, from a statement of the case in the majority opinion, that on December 21, 1846, approximately eight months subsequent to the initial act of the Legislature, the agents named were carrying out the mandate directed to them by conducting a public sale of lots. Two lots were sold by them to William B. Ochletree, and these agents described them as being Lots Nos. One and Two in Block No. One in the plat of said town of Tyler. This deed was recorded September 9, 1849.

Surely, by reason of such calls in above deed pursuant to the public sale held on December 21, 1846, the agents had platted a townsite and a plat of the town was then in existence. The oldest known map of Tyler which was filed for record some years subsequent to the public sale is still recognized today. This map shows that Lots One and Two in Block One of the town of Tyler then faced and abutted upon a rectangular vacant area of ground. Lots One and Two in Block No. One, after a lapse of one hundred years, still faces and abuts upon the same rectangular area of land, here in controversy.

In deeds executed and recorded prior to the time above map was filed for record and subsequent thereto in those early days, from 1853 to 1877, the grantor in the respective deeds after calling for a certain lot in a particular block used the further call as being located on the north side of public square; S.E. corner of public square; fronting on the public square; or the west side or south side of the public square. Through the years to the present such calls have been used and under them every available space that faces and abuts the area is occupied by mercantile buildings. The streets around the area have been constructed in recognition of a public square.

In October, 1847, long prior to the time above map was recorded, the commissioners had ordered that a courthouse be built, and in January, 1849, ordered sold the "courthouse now standing on the public square"; and in 1851 ordered that a

brick courthouse be erected "on the Center of the public square."

In 1850, Tyler incorporated and designated its territorial limits to be: "It shall extend over 100 acres of land in a square, laid off so as to leave the public square of said town in the center * * *." In 1855, the Commissioners Court in its order for a survey called the area a public square and in reporting the results of the survey, the surveyor returned "field notes of the public square of Tyler."

. The intent which the Legislative Acts express, the acts of the agents and commissioners therein named in carrying out the mandates of the Legislature; the constant and repeated reference by city and county officials, surveyor and the citizens of the community to the area as a public square, and every use detailed in the majority opinion constitute, if not an expressed dedication by words or deed, then indisputably an implied dedication of the area as a public square, as a result of the uses made of it for over one hundred years. Too much water has flowed over the dam and too many years have passed in the history of this square for me to agree to disturb the present status of this area at this late date. There is not a single act or official record inconsistent with the intent to dedicate the area as a public square.

As stated in Oswald v. Grenet, 22 Tex. 94, 99, quoted with approval in Ramthun v. Halfman, 58 Tex. 551, 553, and applicable here: "Respecting what will amount to or may be received as evidence of a dedication, the law is too well settled to admit of controversy. A setting apart, or dedication to a public use, to be effectual, need not be by deed; nor need it be evidenced by the use of it having been continued for any particular time; it is enough that there has been some clear, unequivocal act or declaration of the proprietor, evidencing an intention to set it apart for a public use, and that others have acted in reference to and upon the faith of such manifestation of intention. If the act of dedication be unequivocal, it may take place immediately. If there be no such act, it may be evidenced by an uninterrupted use, and that need not be of any particular time." See also 16 Am. Jur., Dedication, Secs. 17, 33, 34, and 45; 26 C.J.S., Dedication, §§ 2, 13 and 15; Lamar County v. Clements, 49 Tex. 347.

Appellee claims that this long continued use of the area as a public square was merely permissible. The supervision of this area was probably lodged in the Commissioners' Court comparable to that exercised by a city in the care of a public park or other public grounds. Other than this, it is my opinion that the acts of the Commissioners' Court were the acts of the public being expressed by this public's elected agency. The Commissioners' use was the public's use. The Commissioners' supervision was that of the public.